The next case of the day is Mance v. Loretta Lynch, et al., others. Mr. Stern? Yes, thank you, Your Honor. I'm Mark Stern for the government. I'm happy to begin either with the merits, which we've briefed, or with the questions regarding standing. What about standing? In the Fourth Circuit case, the government chose not to contest it. But if we go along and have standing, would it conflict with the opinion of the Fourth Circuit? Or is this distinguishable? Or do we have individuals, some yes and some no? Well, I think that the principal difference is that there is a firearms licensee, the dealer, who is a plaintiff in this case. And we're pretty sure that Mance has standing. And that was the principal reason that we didn't raise standing. You're saying we wouldn't be contrary to Lane because Lane didn't have the FFL? That's correct. What about the others? The others, we didn't sort, because of Mance, we didn't totally sort it out. There's one difference between Lane in this case with respect to the buyers, and that's that the buyers here have raised a challenge to 922A3 as well as to B3. And B3 is the provision that governs the firearms licensees. A3 operates directly with respect to the individual purchasers. So to the extent that Lane was based on the fact that B3, which didn't regulate the individuals directly, was the provision being challenged, that would be different. What we do think is true, what the Fourth Circuit said in Lane, was that to the extent that the government does, I mean, the entire fight here is about, and the injury is about this $125 fee that's being charged by the dealer in the district. And what the Fourth Circuit was very correct in saying is that's not a product directly of federal law. Obviously, I understand the argument that you wouldn't be paying this but for federal law. But this isn't a tax imposed by federal law. This is something that is the result of an individual dealer. But you're not, you agree that if the buyers tried to buy a gun in Texas and take it back to D.C., they would be violating federal law. That's correct. Subject to prosecution. So they've got standing to challenge that section of the law. Well, I think you still have to have injury. What about, I mean, potential prosecution? Well, but I think, I mean, you can, I mean, that would have been true in Lane also. I mean, that, and I think that the Fourth Circuit was correct in the way that it analyzed it. Again, we haven't raised, you know, and I think that because the dealer, Mance, clearly has standing that it's probably not necessary for the court to resolve the question with respect to the individuals. Going towards the merits, how many states have a requirement that their residents can only have, lawfully possess a gun in their state if they bought it within the state? I don't know the answer to that question, Your Honor, and I will consult with my colleague, and if she doesn't know the answer, I'll get back to you and tell you. There certainly are lots of states that, and these are the ones that we discussed in our brief, and that the MEKI, the Law Center to Prevent Gun Violence in the Brady Center, probably discussed at even greater length the specifics of various state laws and the requirements that they impose. How does a federally, a federal firearms licensee in a state like California or Ohio or Michigan, how do they go about determining that the state law requirements are met when they sell a gun to a resident of one of their states? It varies by state. I mean, some of them have sort of points of contact that they can, like within the state government. I want to make sure everything you're telling us is in the record. What does the record say about how does a federally, an FFL, make sure it's complying with the federal law? I don't know that this was put in by way of submissions in the record. Or asked for judicial notice or whatever. I think that all the material that's been cited in the briefs was either in the record or is the subject of judicial notice. I don't understand there to be a controversy about that. I just want to make sure that whatever you tell us today, you also, somebody put it in front of the district court. I haven't gone back to see exactly what was in the briefs. I mean, I've read those briefs, but I have not gone back to look at it with that particular question in mind. Back to the question, what does an FFL in a state do when a resident of that state comes to that person to make sure that they are complying with every city, county, local, state law? Well, again, it's going to vary, but they may have a contact in the state government, like an agency who they contact. To the extent that they need to just find out information that isn't available through a contact with the state government, they're responsible for asking those questions. And that's why I think it's the Brady Center brief points out that in California, for example, which has fairly extensive requirements, there are federal licensees who note, we will help you with the process of getting through. They're experts in this. And the whole point of the federal statute is essentially just to protect the states. The states are going to vary in terms of what they're going to do. Some states are much stricter than other states. What all this federal statute does is to say that a state gets to have the sales made through the licensees that are subject to its direct regulation. That's all that this does. Well, I guess my question is this, that part of my question is, with respect to the long guns, rifles, shotguns, the federal law says that a dealer in another state may sell to a non-resident, but they have to comply with state law. And the statute also says it's presumed that that dealer, that federal dealer licensing, knows state law. So you're in big trouble if you sell a rifle or a shotgun in violation of some state's law to a resident of that out-of-state resident, aren't you? Yeah. In general, and I think this is also discussed fairly extensively in the amicus briefs, the regulations with respect to handguns, which are the chief source of criminal— I know the argument is they're more complicated. Yes. My point is that there's a big risk for a dealer to sell to an out-of-state resident unless they are certain that they have complied with that out-of-state resident's state law. Well, the risk, I mean, as a practical matter, may not be that high unless the ability of the federal government to actually enforce the way that all of the licensees are conducting their business is very slim. Congress seems to think that that's adequate, and if a federal licensee sold a firearm, a rifle, or a shotgun in violation of that law, the feds could pull their license or prosecute them or vote. And I think Congress's judgment was that it was not adequate with respect to handguns. I'm not asking about Congress's judgment. I'm just asking, is that the way it works? I think, yes, that's the way it works. And is there evidence about what deterrent effect that presumption has that you sell to an out-of-state resident at your peril because you are presumed to know not just the state law but the city by county by whatever— The threshold question here is to what extent—like, is this, first of all, something that even really impinges on the Second Amendment right? And the Supreme Court in Heller says that laws that put qualifications or conditions on the commercial sale of firearms are presumptively lawful. Certainly that's got to be on a continuum because if the regulation prohibited the sale of handguns, that would not be presumptively. That's correct. So there's no presumption on that end of the continuum. So there's got to be a continuum, number one, where there is no presumption, and number two, what will overcome the presumption? I mean, I think that what you're talking about is a regulation, a statute that simply says you buy this in your state or if you buy it from an out-of-state dealer, then the sale gets consummated in your state. But that's fairly minimal. How many states say you can't lawfully possess a firearm unless you purchased it in your residence? I don't know the answer to that. What I do know is that many states have requirements that you need to meet in order to have firearms that are separate and in addition to those imposed by federal law. They have their letter from the sheriff or whatever in D.C. saying they're good people and it's time for them to have a gun, so then why can't they just go to Texas and buy the gun and be done with it? Right. I mean, that's an argument that could be made in a lot of cases, and essentially it says that, well, we're good people, we showed up in Texas, we informed this dealer of the situation, therefore everything's sort of good to go. And then there's several problems with that. So when Congress creates a scheme to protect the ability of the states, the fact that in some instances it's not going to be sort of of great utility doesn't undermine the validity of the scheme as a whole. I guess I'm wondering on an as-applied challenge, when you have a person who isn't just saying they're a law-abiding citizen, they've gone and they've gotten whatever they have to get from their local guy, so the local control issue has sort of been addressed. And now they want to buy it, they just don't want that thing about having to ship it to Charles whoever in D.C., Charles Sykes, whoever his name is, and pay him $125. They don't want that piece because they say we don't need that because we've got the guy from our – we've got the certificate from our local guy, we've done everything we need to do. Why isn't it then unconstitutional burden as applied to them? I think – Maybe not patiently, but as applied to them. I think that, one, it may be that they've gone in and informed this dealer who now knows about the D.C. requirement. That doesn't mean that dealers throughout the country are going to know about the D.C. requirement or that all the dealers in Texas are going to know. An as-applied question focuses on the application to the particular people. Yeah, but it also – That's why I'm asking about as applied and not everybody in the United States. I think that it focuses in part on the application to the particular person. But, again, the question is, is this sort of – is this legislation, like, is there a reasonable fit? And the fact that in some cases it's not going to turn out to sort of be necessary, does it mean that it's invalid as to that individual? I have a hypothetical. Let's suppose that they're in a particular state or territory or in the District of Columbia. Hypothetically, there is no federally licensed handgun dealer. What effect does that have on the Second Amendment rights of those residents? That would be, like, sort of a more difficult situation. We'd have to, like, address that one if it came up. That isn't the case here. I know. I'm just asking you how – Yeah, no, and I – What would be the analysis that you would apply? Would you say, well, that doesn't implicate the Second Amendment? I mean, I think that one of the questions would be is does the problem arise from a violation of the Second Amendment by that state? I mean, if, say, a state said – No, it's the federal law. I mean, the state just – it's just as an economic reality, there's no federally licensed arms handgun dealer in that state. The state didn't do anything. There's just no dealer. And the residents say, well, I'd like to go to the neighboring state and get a gun. But the only thing keeping me from that is the federal regulation. Vince, what is the analysis? I think that if the effect of the law was to keep you from having a firearm for sort of self-protection of the hearth and home, you know – So that regulation potentially exists as a regulation? That potentially – again, I'd have to see the whole case. But certainly – If that's the case, what scrutiny do you apply? Well, I mean, in sort of positing the hypothetical without knowing all the facts, you could be getting into Heller territory. But here, there is no claim of that sort. Well, I know. I'm just asking – Well, the only reason I'm – I'm just testing the limits of your – I totally understand you, Your Honor. I'm only emphasizing it because the district court applied strict scrutiny to this regulation. And I think that whether or not this is, like, upheld because it doesn't even impinge on the Second Amendment, or whether it passes intermediate scrutiny, which it certainly does. And I think that the Second Circuit's framework in DeCastro is a little bit different from the framework this Court employs. But these things that it said about 922A3, I think, are entirely correct and demonstrate that it passes scrutiny, whether it's at intermediate scrutiny or at the threshold. And I think that's really just, like, the key. You take the position that there were laws in effect since 1909, in the early part of the 1900s, that limited in some way the right of a nonresident to buy a gun within a state. And the counterargument from Mance and the buyers is, well, at that point in time, there was a U.S. Supreme Court decision that said the Second Amendment doesn't apply to handguns. What's your response to that argument? I mean, we look to laws not because they were sort of evaluated, like, because they reflected a determination about the Second Amendment, but because they were sort of – there are laws of longstanding that reflect – At that point in time, the Supreme Court said that those laws don't apply. Well, I mean – The Second Amendment doesn't apply to handguns. I mean, at the other end, we look to practice in colonial America. There was no Second Amendment, you know, at that time. There was no Second Amendment for the first few years of the Constitution. I mean, the point is not whether there was a Second Amendment at that time. The point is, is it the kind of thing where states have said, if you're going to have a firearm in our state, I want you to have gotten permission from us? And that's a longstanding concept that all federal law does is to protect the state's prerogatives in this matter. I don't see my – I have one more question. I'm sorry. In one of the amicus briefs or more, they talk about trafficking across state lines of guns. What was in the record in front of the district court about those arguments? I'm not sure there was material in the district court separate from the sort of publicly available statistics and, of course, the material that was before Congress when it enacted the provision. But I don't understand there to be any real dispute about the fact – I think we're confined to the record in front of the district court. And to the extent that evidence, however you want to cite it, is not in front of the district court, should we consider that? Well, I think that the arguments – I mean, again, I would look back and see exactly what was said to the district court. But the district court was certainly aware of the problem of interstate trafficking that was documented by the record before Congress. And what the district court said essentially was, well, you don't need the solution that Congress thought was appropriate back in 1968 because of developments in technology. And that's the key to the district court's ruling. It's not seriously defended on appeal, and we think it's clearly wrong. Okay. Thank you, Mr. Speaker. May it please the Court, Alan Yuroff for the Appellees. I'm pleased to be joined today at the Council table by my friend, Bill Mateo. We've heard today opposing counsel for the government to state that Mr. Manns has standing, and we've heard him say that the Hansons have standing. One would assume, then, that the Association also has associational standing. While it's our position that Lane was not correctly decided, there may not be too much value in pursuing that with the limited time I have here today. I think it's probably more important to go ahead and discuss the substantive merits of the case. So unless there are any questions on standing, I'd like to go on and talk about the Second Amendment problem that's inherent in this scheme. Let me ask you on the as-applied. Sure. What evidence is there of the specific burden on the Hansons other than the $125? What do they suffer as a result of this law? They suffer various things, and it's not just the $125, which, by the way, would be a sufficient form of injury. I'm not talking about standing. I'm talking about to strike something down under, let's say, intermediate scrutiny as applied to them, I would want to know how are they being harmed. Not how somebody theoretically could be harmed because there's no guns available for 500 miles. How are the Hansons harmed? The Hansons are harmed. Do you know about the $125? What else? They're harmed in various other ways. The fact that they have to go through this process also imposes shipping costs. It also imposes a great delay in time. How many? What, three days? Well, you also have to go and figure out a time to go to the other dealer. I mean, this is you're acquiring multiple trips. It does limit choice and selection. It has another effect on price. How does it limit choice and selection? What's in the record for limiting choice and selection? Well, for most people, the Hansons obviously are the individual plaintiffs in this case, but we're also suing on behalf of members of the committee generally who are located throughout the United States. And Americans everywhere who are handgun consumers, like consumers of any other product, are harmed when they are deprived of access to a national market. If they can only shop in their home. I don't know that we can say that. I mean, for example, in Texas, there is quite a robust market of firearms. I don't think Texas citizens are in any way put out by having to go around Texas and buy firearms. There's gun shows. There's umpty-umps, stores, et cetera, like that. That's why I'm asking on the as-applied. It seems to me there could be situations where the market is affected to the point that somebody has a monopoly and charges outright, you know, a gun that's supposed to cost $500 costs $5,000. So I'm looking for that kind of evidence. What can you tell me about the Hansons? You said the $125, the shift in cost, and the delay. What else? Well, that's, since there are no current gun stores in Washington, D.C., I suppose we can't say that that makes a difference. But one would suggest that if there were, let's suppose that there were a gun store in Washington, D.C. that the Hansons could shop at. The fact that they were limited to that store's selection and couldn't as easily go ahead and acquire guns when they're visiting here in Texas, it's not a random thing that the Hansons visited Texas. They have a connection to the state. They come here often. And there are many people who travel to various, from one part of the United States to the other, and they like to go shopping when they do so. Okay, let me put it, come at it this way. Where a law impinges on, really, maybe the people of D.C. are impinged upon because of the lack of a robust gun market, whereas the people of Texas really aren't because, you know, you can't go a couple miles without finding some sort of place you could buy a gun. Is that a circumstance where the appropriate challenge is an as-applied-by-the-individual rather than a facial because certainly the burden in Texas isn't the same as the burden apparently in D.C. or maybe some other state? Well, we have both an as-applied and a facial challenge, but I would suggest, Your Honor, that, for example, in carry versus population services, the Supreme Court didn't inquire as to whether contraceptives were very easily available throughout the state of New York. One would suggest that we could assume that New York has a robust market for contraceptives as much as Texas has firearms. You know, we can't make those types of guesses. For the Supreme Court, it was enough that we know that when you exclude large numbers of available dealers, you— See, we haven't done that. We haven't excluded large numbers of available dealers, so I don't know that we can make assumptions. So I'm asking about the record and I'm asking you to tell me the assumption that we would make here is that in Texas, you have a huge robust market and apparently in D.C. you don't. What would we learn from that? And what evidence do we have that would contradict that or support that? Well, we know that people who wish to purchase a product, and this is perhaps something that's—I hate to use the word common sense, but when people want to purchase a product and they're prevented from doing so outside the confines of their own state, that does impose a significant burden on them because they have to travel, they have to pay extra money, they have an intent lawsuit. I don't understand that. I mean, if I can go down to the local grocery store and buy a cucumber, why does the fact that I can't buy a cucumber in Wyoming really impinge on me because I'm not going to Wyoming. I'm going to live in Texas. I can buy the cucumber. I understand if I can't buy the cucumber in Texas and I have to get it from Wyoming, I get that. But to me this seems backwards of the real typical problem. The typical problem is you can't get it in your own state, which seems maybe is the case with D.C., but isn't the case with Texas. So why does it on its face burden everybody to have to buy stuff in their own state when the stuff is a handgun? For the same reason it would burden them if the stuff were a book or a birth control pill or a religious article or anything else that's to do with constitutional protection. When the government says that—I mean, what if we did this with books and we said, look, we have community standards for obscenity in many localities. So in order to secure the local interests and community standards, we're going to say that you can only buy a book in your own state where the licensed bookseller is aware of the community standards. And, of course, you can have any book you want in America shipped to that bookseller, and he will go through the process of figuring out whether it's legal in your jurisdiction and then transfer it to you. I think most people would say that's a significant burden on access to reading material. And the same thing is true with guns or cucumbers. The implication there is you'd be deprived of a particular book. What is it? Soul on Ice is always the one that people said was banned in, like, school libraries. So if I wanted to go buy that in Texas and they decided that didn't fit, you know, back in the 50s or 60s, this doesn't fit our standards, then I'm deprived of the book. But here, I'm not sure that's really what's happening. There's not a, like, type of gun you cannot at all get. Well, first of all, if the book is one which indeed fails community standards, then I suppose that that result would not necessarily violate the First Amendment if one accepts the obscenity doctrine and all that goes with it. But the fact of the matter is that when people go shopping for things, we have a national market for everything. This is a lot of people fought very hard to preserve the union, right? And part of that means that we can travel freely throughout the United States and we can find ourselves someplace and we can transact and do business, especially with respect to those specific things that are not very many of them, which the Supreme Court has found to be imbued with fundamental constitutional protection. So this is a very serious infringement on the Second Amendment. And I think it's not up to us to justify it. And this is the other thing, too. The standards of scrutiny here are in large part irrelevant. We know it's heightened scrutiny. We know that means either strict or intermediate. And everybody always gets into a fight about whether it should be this or the other. We actually don't care all that much. And the reason is it's the government's burden no matter what, their burden to justify this restriction by showing that there's an appropriate fit, either a strict scrutiny fit or an intermediate scrutiny fit that justifies this law. So let's see if they can do that. Well, we can, unless there are any questions, I'm assuming we can get past step one. There is a right to acquire a handgun. I just have a question. Sure. Did anybody contend in the court below that people traveling to Texas who plan to, or some other state in their residence, state residence, have a right to buy a gun to use to protect Coleman Hearth while they're visiting the state? We didn't make that specific argument, but we would say that that is absolutely the case. It's an issue that came up in another. It's not an issue here. The Hansons and their association are not contending, well, when we spend a significant amount of time in a state that's not our residence, we're entitled to buy a handgun to protect ourselves. We would contend that that is true, in fact. Is that part of this case? That's my question. I think it's inherent in the case, Your Honor, because people have the right to access. Was it briefed? Was it argued? Not specifically, not that particular angle. But I think it's inherent. We know the Second Amendment at its core. I have a question. Sure. I don't want to go beyond what arguments were made in the district court. If that argument wasn't made, I just need to know it. I don't recall that that specific angle was mentioned in district court. I do, however, Your Honor, would submit that that is inherent in the claim. We need to bring another claim. That's not in front of us. That's not in front of us. That's the question. It's in front of us, and we're not. Actually, no, Your Honor, now that I come to think of it, I believe this came up at argument. I believe that Judge O'Connor raised it. He had a series of hypotheticals about people who are attending a rally of some kind. It's in the transcript. Judges coming from Texas to Louisiana need protection on Bourbon Street? Sure. They probably do. Do we bring the gun with us, and do we have to buy it on Bourbon Street? Well, you can do both here in Louisiana. You can bring it with you, and I'm sure you can buy it. Well, I don't know about Bourbon Street specifically as a gun store. But, Your Honor, actually that was raised at argument, now that I recall, in the transcript. Judge O'Connor pursued that line of questioning with the government. It was something we discussed. How does Mance in Texas, Arlington, is that where his story is? Correct. How does he determine when he sells a gun to a Texas resident whether he is in compliance with the various state and local laws? How does he know what's required in Houston or Austin, Texas? Okay. I believe that I don't know exactly what he does, but my understanding is twofold. Number one, FFLs do transact a lot of business across state lines with respect to rifles and shotguns. They have books, resources. Some states are point-of-contact states. Some states have eligibility checks. I know California's got one of those. With respect to this case, when you're talking about a D.C. resident, or I believe also would be the case with a Michigan or North Carolina resident, it's really easy because the police have issued a license to purchase a firearm. And so he would know, just like everybody in Maryland and Virginia knows. If somebody walks in with a paper, how am I to know that this is a legitimate license to carry a firearm from a particular state? Well, he's free to pick. If someone walks into an FFL, into a dealership, and they have a piece of paper and the dealership wants to verify that paperwork, I suppose they can pick up the phone and call. How does he satisfy himself that he's not violating some law in Austin or Houston when he sells a gun in Arlington to a Texas resident? Well, since he does business in Texas primarily, I'm sure he's very well versed in the Texas laws. Where does he get his information? I don't know exactly where the FFLs get their specific information about the laws of each state, but I know that they do that. It is standard practice. How can he expect another state for Nevada? How does a Nevada dealer determine what's lawful in Austin, Texas, Houston, Texas, Wichita Falls? They have ways of looking it up, Your Honor. What are those ways? I'm not sure exactly. What is the record that shows what those ways are? The record is that there's a presumption that they know that they're going to follow the law, obviously, and Your Honor referenced that. They want to follow the law. Sure. And so how do they find out if they're in compliance? The same way that people fill out tax returns in various states where they owe money, the same way that people do other things to comply with various state laws with which they interact. He can look it up, and I'm sure that gun dealers have resources for that. If Congress hadn't adopted a statute similar to long guns that said federal firearms licensees can sell handguns to residents of other states as long as they comply with all state and local laws, and they are presumed to know the state and local laws, would Mr. Mance be willing to sell firearms in all 50 states? I think he would. How would he go about making sure he complied with all state and federal local laws? What's the evidence on that? The same way that he does that with rifles and shotguns, and the same way that any FFL does that with rifles and shotguns. Tell me how that happens. Your Honor, I'm not myself an FFL. Well, the arguments are that the state databases are not accessible by the FFLs. What is the evidence on all of this? We've got arguments coming at us from all these angles, and I'm trying to get at what is the real evidence of how a dealer would go about doing that? Your Honor, the specific technical details of what phone number or what database, if they have something like a Lexus that they look up, that level of specificity is not something that I myself am not a gun dealer. We didn't brief it at that level of detail. However, what is in the record, and what's well known and not challenged by anybody, and, in fact, it's within judicial notice, is that there is a vibrant market for interstate long gun sales in this country, and everyone in Washington, D.C. who has a rifle or shotgun. They also argue that there are much more prolific handgun laws than there are rifle and shotgun laws. I'm not so sure about that, Your Honor. That's perhaps a— Again, here's the argument. What is the evidence? The evidence is this. The evidence is that there are many complicated and difficult rifle laws in this country, particularly these days, all kinds of assault weapons definitions and the like. Is there any evidence that that deters some, most, many federal firearms licensees from selling particular weapons or particular guns across state lines where it's locked? Well, it is within judicial notice that dealers do sell rifles. Let's look at Washington, D.C., for example. Washington, D.C. has a very strict and severe assault weapon type law. The model there is after California's. Nonetheless, despite a great deal of material in the D.C. municipal regulations and the D.C. code dealing with rifles, there are many district residents who go to the gun stores in Maryland and Virginia and walk out with rifles because those dealers have figured out that when they get an MPD, a Metropolitan Police Department authorization from Chief Linnear— What about Texas or California? The dealer might say— Would it be an adequate, reasonable deterrence? I'm looking at FIT under intermediate scrutiny here. Would it be an adequate, reasonable deterrence to say, well, we could do the same thing with handguns that we've done with long guns because the federal firearms licensee sells at their peril? They're presumed to know the law. Would that deter cross-state line sales unless the dealer is certain that they have complied with all local law? Absolutely, Your Honor, because gun dealers— Tell me what the evidence is about that. Well, the evidence is that we—I mean, we know that this market exists without a lot of FFLs going to jail all the time, and I suppose that if they were to commit a violation, they would go to jail. They'd be prosecuted. If a gun dealer in Texas sells a prohibited rifle to somebody in California, for example, one would expect that that dealer would be brought up on charges for violating 922b3 at the very least, and they would go to jail, and I'm sure there are people in jail today who have violated 922b3, and we're not challenging that. We know that a lot of things are regulated in this country. Gun sales, of course, are one of those things. And the theory of American government is that we're going to make a bunch of regulations, and you're all supposed to follow them and know what they are. And if you ignore the law at your peril, obviously, not just with respect to guns, but with respect to a lot of things, and so the country functions, and we have a functioning market. The government never said. I mean, they never came in and said, oh, we've got an epidemic of rifle violations. How much worse would it be if this were all a handgun problem? No. They pretty much acceded to the well-known and established fact that since, I guess it was 1986, we've had these sales go through. And if all we're asking for is for the government, if it's truly concerned about respecting the local preferences of states and localities, to respect those preferences of those localities that want the transactions to go through, right? I mean, first of all, there's no anti-circumvention interest that's being satisfied, none at all. How many states have the requirement that its residents can only possess firearms that are purchased in its state? None that I know of in terms of possession. I mean, you can possess a firearm, for example. If you purchase a firearm legally in one state and then you change your residence to another state, so long as that firearm is legally free to purchase in their own state. I don't know how many exactly. I know that there are a few, and there are many that aren't. Texas doesn't have such a law. I looked it up. I know Vermont didn't have such a law when I looked at it. I'm pretty sure Louisiana doesn't have such a law. Virginia, oddly enough, also doesn't have such a law, which is interesting because this came up in Lane. They had a statute, and we sued over it because they had this type of law, which seemed to most people, to myself at least, to show that, in fact, there was a prohibition on these types of sales. And at the Fourth Circuit, you can listen to the audio tape, a Virginia solicitor general got up and said he had an interpretation of it that essentially interpreted the matter away and sort of disowned that effect of what I thought was a fairly clear Virginia statute. So what we do know is that there are many millions of people. And the Hansons, we do have an as-applied challenge here as well. We've got a city, the capital city of this country, that's got some half a million or more residents, none of whom can purchase a handgun in a local store. They live in a city which is not necessarily in love with the Second Amendment. Why can't they purchase one? There is no store inside Washington, D.C. Why is there no store? I think it's an historical circumstance that guns are banned. There's no restriction from the government telling a federal firearms dealer they cannot open a store and sell guns in D.C. In fact, you're right, Your Honor, that's true. They don't make it easy. There are all kinds of zoning restrictions. This was also an issue in Lane because when Mr. Sykes lost his lease, he had nowhere in which to relocate. And the D.C. government, realizing what they had done by perhaps overzealously regulating, on the eve of the argument in the district court, they passed an emergency resolution in their zoning board that authorized gun sales at the police station, and they gave him a room at the police station. That's where he sits today. You can go, if you're a D.C. resident, you can go to Mr. Sykes in the police station. You can search the Internet and put an order in for him for whatever you want to buy. He'll go procure it from some other state. He won't procure it. He will accept a FedEx shipment. And so you have to pay FedEx. You have to pay him $125. Do you order it from the out-of-state dealer? How does that work? I mean, if you want to buy a gun in D.C. and you go to Mr. Sykes, how do you get a handgun? Well, first you have to go to the store. I realize my time is up, but I can answer the question. But first you go to the store where you're going to be shopping. The people have the inventory. He doesn't. He has no inventory. He has no inventory. And you take down the information. You agree on a price, whatever you do. And then you have to, they have to agree to ship it to Mr. Sykes. Mr. Sykes then will help with the forms and runs the checks, so to speak, with the D.C. Police Department. Once that is approved, then I believe he can turn the handgun over. I can't walk in with an Internet page to Mr. Sykes and say, I want this handgun. Order it for me. I don't believe he'll do that. I think he'll take a FedEx. You can say, I'd like to get this handgun. Can I transfer it through you? And if he says yes, it's $125, then you say, okay, I'll go and make sure this is shipped to you. There's nothing in it. He could do it if he wanted to. He just won't do it. That's correct. The transfer fee is charged by whom? By Mr. Sykes. The law itself doesn't charge. It's the arms dealers that have set up this transfer fee. But no arms dealer in the world would do it for free because people usually don't work for free in America. Amazon and all the others, they charge you for shipping, so it's natural to charge to transfer something from one place to another. That's not the shipping. It's also the fact that he's doing the service of providing the transfer. How did they come about this amount? That's $125. You have to ask Mr. Sykes. Okay. It's his figure. It's not everybody's. That's correct, but that figure is reasonably foreseeable once you understand it's the government who's forcing people to go through a middleman who wouldn't otherwise exist. No, and I understand Sykes is being paid because he's taking the responsibility for checking that these people are properly allowed to receive this gun. He isn't simply being a place where you can pick up your FedEx packages. He's more than that, right? Yes. He has a legal obligation to do more than simply let you pick up a FedEx package at his office. Yeah, and yes, Your Honor, but the D.C. police— He has to check these people out and make sure that they're this and that, whatever it is he's supposed to do. I believe that— Can he be held liable if all he did was receive—if Mance sent Sykes the package and Sykes didn't touch it, didn't do anything, just let it sit on his countertop after the FedEx guy delivered it, and the Hansons walked in and picked it up, would Sykes have satisfied his obligations under the law? No, Sykes would never let you touch that FedEx package, though, until D.C.'s police chief approved the transfer. So that's when he's being paid the $125,000? Yeah, he's in the same building, and they stamp—they give him the PD-209, and they—the D.C. police conduct whatever checks they wish to conduct, in addition, of course, to the federal background check. D.C. has a check. I'm not sure exactly what they do, but D.C. has to approve the transfer. They specifically—some states have a license to purchase a firearm. D.C. actually has pre-registration. But my point is that Sykes has an obligation to check that out. That's right. Hands over the package. That's right, but that—that's right. Thank you, Your Honors. Again, we would submit—I see our time is up. If there are no further questions, this law is not constitutional. Thanks. Thank you. Mr. Stern, anything you want to add? Or are you just down here to buy a gun so you can take it back to D.C.? Only in strict compliance with the law, Your Honor. I mean, even if we were to say this isn't facially unconstitutional, isn't it unconstitutional as applied to D.C. residents, specifically the Hansons? Because they can't go to a store and buy a gun. They have to go through this whole gyration that costs them more money. Well, I mean, the cost more money part is it. I mean, if you look at the— That's kind of big. But also, they can't go down the street and buy a gun the way I can in Texas, the way— They can't go down the street, but they don't have to come to Texas to buy it either. They don't—I mean— They have to go somewhere other than their own town. No, they don't. They can, like, buy this. I mean, it's true Sykes won't put in the order for them, but they don't have to come to Texas. They could make their arrangements. There's a nationwide market. The only thing that is being complained about is the $125. There's no allegation here about any other inconvenience. He's the only guy. He's got his little cubby there at the police station. What if he decided to charge $500? What about $1,000? Your Honor, there's— What point would it become, in your view, a violation, an as-applied violation of the Second Amendment, what Sykes decides to charge? Your Honor, there's probably a point out there. That might be a problem for the results from the D.C.'s zoning restrictions, which Mr. Gura adverted. D.C. is not a party in this case, chose to bring this case in Texas, not in D.C., and not to sue D.C. So if D.C. is making it hard to the point where there are no dealers, maybe that's a problem with D.C. law. What we have right now is no greater a fee than was the issue in DeCastro in the Second Circuit, where the Second Circuit said, this doesn't even get on the map for us. I'm going to think that that's absolutely right. And also note that there's just an interest in part of whatever the jurisdiction is, whether it's D.C. or the state, in being able to enforce its laws. What if 45 states do not object to their residents going across state lines and buying handguns as long as the handgun and those residents meet state law requirements? The point about it is that D.C. doesn't object to that. What D.C. does have, just like all the other states have, is the ability to go to their firearms dealers over whom they assert authority. They can see, are you keeping records? And, in fact, D.C. law requires that its FFL maintain records. Well, Sykes could not simply be a place where a FedEx package is delivered and he leaves it on the counter and waits for the Hansons to come back. He has to do more than that. It's kind of hard to get that out of your opponents. Sykes is the responsible person in this scenario. Well, what Sykes has to do is he's responsible for ensuring that the proper forms come from D.C. and he's got to do the mixed background check. And he's responsible if he knowingly, and I should say that the requirement about these things is always to knowingly sell to somebody who's not qualified. It's not a strict liability standard. And he's responsible. He's also responsible for maintaining the records so that if there's a crime in D.C. and D.C. wants to check records, it knows where to go. It can go to its own firearms dealers. You can't sell into a state unless you comply with all the state's laws including you agree to keep records, you agree to respond to police inquiries about the pistol or the gun, you agree to the waiting period, you agree that they have to present their certificate of compliance that they've taken the course. What if the federal law said as long as you can sell if you do completely comply with state law? I think there's a reason why that isn't the way federal law is written because the state's federal law agents can't and don't enforce the law in the same way and without the aid of the states that can go and check the people over whom they've got jurisdiction. And federal law recognizes that requiring dealers all over the country to be Federal law would allow him, the hint is, to go to Maryland and buy the gun but for the federal records. Well, it allows them to do it, sure. I mean, but the only thing that They don't have to. The Maryland store does not have to keep the records because of D.C. law. D.C. law does not require them to do that. They say you have our blessing to go buy guns from D.C. But D.C. knows that there's a federal law. But it says if, as and when the federal law, we don't care. Well, D.C. hasn't said we don't care. I mean, D.C., like, sort of, it's set up so that D.C. can, like, rest assured that its firearms dealer is responsible and there's somebody whose office is, in fact, next to the police station whom they can hold responsible. D.C. law also allows its citizens to buy from Maryland or Ohio or Texas if it's not in contravention of federal law. Well, that's right, but federal law requires that Or D.C. doesn't care if they keep the records. No, but federal law requires, I mean, federal law requires the sale to be made through the D.C. FFL. So when D.C. says as long as it complies with federal law, that's part of federal law. So I don't feel like D.C. is saying, oh, I don't care, like, you know, like, forget it. You know, you can, like, people all over the country can, like, try to keep these records. Federal law doesn't require the records keeping. No, no, that's true, but D.C. understands what federal law requires. I think that's the key point in sort of that equation. The court's been very generous with its time. Thank you so much. Thank you. Thank you all.